D. Maimon Kirschenbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, New York 10004
Tel: (212) 688-5640
Fax: (212) 688-2548

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
**KIMBERLY D. BOLER,**

        **Plaintiff,**

  v.

**THE CRONE LAW GROUP, P.C.,**

        **Defendant.**
-------------------------------------------------------------x

**Index No.:**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Kimberly Boler, by and through her attorneys, alleges as follows:

**NATURE OF THE CASE**

1. Kimberly Boler, an experienced securities attorney and alumnus of Harvard College and Columbia Law School, was hired as an attorney by The Crone Law Group, P.C. ("CLF"), a boutique securities firm, in August 2019. Her excitement about her new job was quickly dashed when, over the course of the next few months, she discovered that the firm and its managing partner, Mark Crone, was engaged in violations of the New York Rules of Professional Conduct. Most concerning to Ms. Boler was her discovery that David Lubin, who Mr. Crone introduced to her as an attorney with over 30 years' experience with securities transactions, had in fact resigned from the New York State bar for disciplinary reasons in 2017 after pleading guilty to a conspiracy to sell unregistered securities. Despite this, Mr. Crone insisted that Ms. Boler and other CLG attorneys utilize Mr. Lubin to draft legal documents and opinions and submit those

documents and opinions to the Securities and Exchange Commission and CLG's clients without reviewing the content of those documents and opinions. Deeply concerned that this conduct constituted the unethical facilitation of Mr. Lubin's unauthorized practice of law, Ms. Boler in December 2019 and February 2020 complained of the conduct to Mr. Crone, advised him that the conduct violated both New York State law and the rules of professional conduct, and refused to allow Mr. Lubin to participate any further in her transactions. One week after her second complaint, Mr. Crone retaliated against Ms. Boler by terminating her employment because of her unwillingness to work with Mr. Lubin. Mr. Crone's insistence that Ms. Boler "act unethically and in violation of one of the primary" rules of professional conduct and then retaliating against her when she complained and refused – constitutes a breach of implied contract under New York law. *See Wieder v. Skala*, 80 N.Y.2d 628, 635-36 (1992).

## JURISDICTION AND VENUE

2.  This Court has original federal diversity jurisdiction under 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen and resident of New York. The Crone Law Group, P.C. is a professional services corporation registered in the State of California.

3.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

4.  Defendant The Crone Law Group, P.C. ("CLG") is a boutique law firm that is registered in California as a professional corporation.

5.  CLG – which specializes in the areas of securities law and corporate finance – has an office in New York located at 500 Fifth Avenue, Suite 938, New York, NY.

6. The founder, CEO, and managing partner of CLG is Mark Crone.

7. Plaintiff Kimberly Boler is an attorney who was employed by CLG in its New York office from August 2019 to February 2020, when CLG terminated her employment.

8. Ms. Boler is a citizen of New York and a member of the New York bar.

## FACTS

9. In November and December 2018, Mr. Crone actively recruited Ms. Boler to join CLG.

10. Over the course of numerous phone calls in which he attempted to recruit her to join CLG, Mr. Crone informed Ms. Boler that CLG did not employ any paralegals.

11. In February 2019, Ms. Boler commenced working with CLG as a contract attorney. Although Mr. Crone had attempted to recruit Ms. Boler as a partner, she declined to initially join the firm as a partner because she was not familiar with its practices.

12. Prior to working for CLG, Ms. Boler was employed at the firm of Sichenzia, Ross, Ference LLP ("SRF"), another securities law firm located in the State of New York.

13. From February through July 2019, Ms. Boler worked remotely for CLG on a contract basis. During this time, she led several corporate transactions on behalf of CLG, had direct interaction with CLG clients, and primarily reported to Mr. Crone and Eric Mendelson, another partner at the firm.

14. In August 2019, Ms. Boler became employed by CLG as a non-equity partner. In this capacity, Ms. Boler was employed by CLG on a full-time basis and began working from the firm's New York office. By the terms of her offer letter, Ms. Boler was classified as an at-will employee of CLG.

15. After Ms. Boler joined CLG, Mr. Crone divided responsibility for most of the firm's clients between her and Mr. Mendelson.

16. After beginning her full-time employment with CLG, Ms. Boler became increasingly concerned with a number of the firm's questionable and unethical practices.

17. First, in July 2019, Mr. Crone assigned Ms. Boler to work on a corporate transaction involving a company called Life Electric Vehicles ("LEV"). In this transaction, CLG represented an investor, a company called Valor, Ltd. ("Valor")

18. Mr. Crone informed Ms. Boler that for the LEV transaction, she was to work with and take direction from Adam Gottbetter. Ms. Boler understood that Mr. Gottbetter worked for a company called Global Emerging Markets ("GEM"), an alternative investment group which manages investment vehicles and acted as Valor's investment advisors in the LEV transaction.

19. During the course of the LEV transaction, Ms. Boler learned that Mr. Gottbetter was a former attorney who had been disbarred and sanctioned by the U.S. Securities and Exchange Commission ("SEC") because of his involvement in several "pump and dump" securities fraud schemes.

20. When Ms. Boler asked Mr. Crone about Mr. Gottbetter, he informed her that Mr. Gottbetter was not listed on GEM's website because of his past disbarment and sanctions.

21. Over the course of September 2019, CLG was inundated with corporate transactions.  During this time, Mr. Crone informed Ms. Boler that several clients had complained about the slow turnaround time of certain projects being managed by Mr. Mendelson.  Mr. Crone insisted that Ms. Boler push Mr. Mendelson to complete projects in a more efficient manner.

22. During the firm's September 2019 monthly meeting, Mr. Crone introduced Ms. Boler to David Lubin, who he introduced to her as an attorney with over 30 years' experience

4

working on SEC transactions. Mr. Crone informed Ms. Boler that the firm would be utilizing Mr. Lubin to assist with its overflow work. Mr. Mendelson later informed Ms. Boler that Mr. Lubin had worked on behalf of the firm on numerous prior occasions.

23. Later in September 2019, Mr. Lubin began working from CLG's New York office on a full-time basis. Mr. Crone insisted that Ms. Boler and Mr. Mendelson use Mr. Lubin for assistance on all securities law matters, rather than the assistance of the firm's other contract attorneys, John O'Leary and Nancy Malloy. Mr. Lubin began drafting documents which would typically be drafted by an attorney without being supervised by an attorney. Mr. Lubin drafted SEC periodic reports, legal opinions, asset purchase agreements and documents for SEC securities offerings. Mr. Lubin also structured specific securities transactions by, for example, completing regulation A offerings for several of CLG's clients.

24. Mr. Crone informed Ms. Boler that CLG was paying Mr. Lubin an hourly rate of $150 per hour. In Ms. Boler's experience, market rate for a corporate contract attorney in New York City is approximately $100 per hour.

25. In October 2019, Mr. Crone instructed Ms. Boler to only "blind copy" Mr. Lubin on emails because Mr. Lubin was not officially a member of the firm.

26. Over the course of October 2019, Mr. Crone increasingly insisted that Ms. Boler use Mr. Lubin's work on more transactions. He also told Ms. Boler and Mr. Mendelson to forward Mr. Lubin's work product to clients without taking the time to review it beforehand.

27. Mr. Mendelson informed Ms. Boler during this time that Mr. Crone kept asking him to pass more work to Mr. Lubin and then take credit for Mr. Lubin's work product. Mr. Mendelson told Ms. Boler that he felt uncomfortable passing Mr. Lubin's work off as his own.

28. Later in October 2019, Mr. Crone advised the CEO of LEV to engage an attorney named Harvey Kesner as outside counsel for the transaction with Valor. This concerned Ms. Boler because she had previously worked with Mr. Kesner at SRF and knew that he had been forced out of that firm by its other partners because his actions at SRF had caused one or more securities litigations to be commenced against the firm. Ms. Boler cautioned Mr. Crone not to work with Mr. Kesner because he was named in ongoing securities litigation and was potentially under investigation by the SEC in connection with securities fraud schemes. Despite her warnings, Mr. Crone continued to recommend Mr. Kesner to LEV and instructed LEV to engage Mr. Kesner as LEV's outside counsel.

29. After being engaged by LEV, Mr. Kesner made several recommendations with respect to the LEV/Valor transaction that Ms. Boler feared could result in fraudulent conveyances if the recommendations were followed. Ms. Boler expressed her disagreement with Mr. Kesner's recommendations to both Mr. Crone and Mr. Gottbetter. Mr. Crone and Mr. Gottbetter instructed Ms. Boler to comply with Mr. Kesner's recommendations.

30. In November 2019, Mr. Crone terminated John O'Leary's engagement with the firm and instructed Ms. Boler and Mr. Mendelson to utilize Mr. Lubin's services more. Over the course of the month, Mr. Crone complained on several occasions to Ms. Boler and Mr. Lubin about what he viewed as Mr. Mendelson's slow turnaround time. Mr. Crone stated that there was no need for Mr. Mendelson to review Mr. Lubin's work.

31. Mr. Crone also increasingly began to hold conference calls with clients involving securities transactions with only Mr. Lubin present. Ms. Boler understood that Mr. Crone wanted Mr. Lubin to be present for these calls because Mr. Crone himself had relatively little experience with securities law compared to Mr. Lubin. On one occasion that Ms. Boler was also present

during one of these conference calls, she observed Mr. Lubin whispering his legal advice to Mr. Crone, who then repeated that advice to the client.

32. In November 2019, Mr. Crone, in the presence of Ms. Boler, informed CLG's office manager, Courtney Truesdell (who is also Mr. Crone's girlfriend), that Mr. Lubin's time should be billed to clients under Mr. Crone's name.  When Ms. Boler questioned Ms. Truesdell about this practice, Ms. Truesdell informed her that she and Mr. Crone "regularly pad clients' bills anyway. That's how we ensure that clients pay CLG what it is due."

33. In late November or early December 2019, Mr. Lubin became upset with Ms. Boler when she accidentally copied him on an email to clients.  When Ms. Boler discusses the incident with Mr. Crone, he informed her that Mr. Lubin was technically only allowed to act as a paralegal.

34. Ms. Boler was extremely concerned upon learning this information because Mr. Lubin had been working with CLG in the capacity of an attorney on a full-time basis for the last several months.

35. Ms. Boler decided to conduct her own independent research into Mr. Lubin and discovered that he had resigned from the New York State bar for disciplinary reasons in December 2017.

36. Specifically, Mr. Lubin had acknowledged in an affidavit submitted to the Second Department in June 2017 that he was the subject of an investigation by the United States Attorney's Office for the Southern District of Florida and had entered into a preliminary plea agreement that contemplated his pleading guilty to conspiracy to sell unregistered securities.

37. In its opinion accepting his affidavit of resignation, the Second Department barred Mr. Lubin "from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, judge, justice, board,

commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law." *See In re David Lubin*, 157 A.D.3d 53 (2d Dep't 2017)

38. Ms. Boler also discovered that Mr. Lubin had been sanctioned by the SEC in July 2017, which had barred him from appearing or practicing before the SEC as an attorney.

39. Upon learning this information, Ms. Boler confronted Mr. Crone in December 2019, telling him about her findings and informing him that his insistence on allowing Mr. Lubin to draft legal documents and opinions for clients without supervision may violate the law and the rules of professional conduct. In response, Mr. Crone stated that Mr. Lubin "turns documents around faster" than Mr. Mendelson and other attorneys working on behalf of CLG.

40. Over the course of January 2020, Ms. Boler conducted further research on both Mr. Lubin and the rules surrounding the unauthorized practice of law.

41. That same month, Mr. Lubin performed all legal work in connection with the acquisition of a Cayman Island company by one of CLG's corporate clients.

42. Ms. Boler concluded, based on her research, that Mr. Lubin's drafting of legal documents, his rendering of legal opinions that were furnished to clients without any oversight, and Mr. Crone's passing off Mr. Lubin's legal advice as his own, constituted the unauthorized practice of law and violated the terms of the Second Department's opinion accepting Mr. Lubin's resignation from the New York State bar.

43. In the first week of February 2020, Ms. Boler again complained to Mr. Crone that, based on her research, Mr. Lubin was practicing law as an attorney in violation of New York law and the rules of professional conduct. Ms. Boler informed Mr. Crone that she did not feel

comfortable allowing Mr. Lubin to listen in on conference calls with clients or draft any documents for her transactions, as he was clearly not permitted to practice law.

44. On February 13, 2020, Mr. Crone terminated Ms. Boler's employment with CLG, citing her unwillingness to work with Mr. Lubin who "does the work of two attorneys."

45. Mr. Crone also stated that CLG was facing financial challenges.

46. This latter reason for Ms. Boler's termination was clearly pretextual. On or about January 28, 2020, CLG had hired a new attorney, Eleanor Osmanoff.

47. In addition, on February 15, 2020, Ms. Boler was contacted by a former colleague who told Ms. Boler that she had been contacted by CLG about interviewing for an attorney position at the firm.

**FIRST CLAIM FOR RELIEF**
**(Breach of Implied Contract – New York Law)**

48. Ms. Boler realleges and incorporates by reference all previous paragraphs.

49. Adherence to the ethical standards of the legal profession is an implied term of any employment agreement between an attorney and a law firm. *See Wieder v. Skala*, 80 N.Y.2d 628, 635-36 (1992).

50. Rule 1.5 of the New York Rules of Professional Conduct (the "Rules") provides that a lawyer shall not charge or collect excessive legal fees.

51. Rule 5.1 of the Rules provides that law firms and lawyers with management or supervisory responsibility at law firms make reasonable efforts to ensure that the firm's lawyers conform with the Rules.

52. Rule 5.3(b) of the Rules provides that a lawyer shall be responsible for the conduct of a nonlawyer that would be in violation of the Rules if the lawyer: (1) "orders or directs the specific conduct or, with knowledge of the specific conduct, ratifies it," or (2) has supervisory

responsibility over the nonlawyer and "knows of such conduct at a time when it could be prevented or its consequences avoided or mitigated by fails to take reasonable remedial action."

53. Rule 5.5(b) of the Rules provides that a lawyer shall not aid a nonlawyer in the unauthorized practice of law."

54. Rule 8.4(a) and (c) of the Rules provides that a lawyer or law firm shall not: (1) "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another"; or (2) "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

55. Pursuant to N.Y. Judiciary Law § 478, it is unlawful for any person not admitted to the bar to, *inter alia*, engage in the practice of law, render legal services, or convey the impression that he is a practitioner of law.

56. In its Opinion granting Mr. Lubin's application to resign as an attorney, the Second Department ordered, pursuant to Judiciary Law § 90, that Mr. Lubin "desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, judge, justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law." *See In re David Lubin*, 157 A.D.3d 53 (2d Dep't 2017).

57. Mr. Lubin's conduct of preparing legal materials (including SEC periodic reports, asset purchase agreements, and documents for SEC securities offerings) and drafting legal opinions for submission to clients after resigning from the practice of law constitutes a violation of N.Y. Judiciary Law § 478.

58. CLG's practice of utilizing Mr. Lubin's services for the preparation of legal materials, drafting legal opinions for submission to clients, and refusing to supervise his work product constitutes a violation of Rules 5.1, 5.3, 5.5, and 8.4 of the Rules of Professional Conduct.

59. Mr. Crone's insistence that clients be billed for Mr. Lubin's work under his name constitutes a violation of Rules 1.5 and 8.4 for the Rules of Professional Conduct.

60. CLG retaliated against Ms. Boler for complaining about and refusing to participate in the firm's unethical practices terminating her employment.

61. Such conduct – insisting that Ms. Boler "act unethically and in violation of one of the primary professional rules" and then retaliating against her when she complained and refused – constitutes a breach of implied contract under New York law. *See Wieder*, 80 N.Y.2d at 637-38.

62. As a direct and proximate result of CLG's breach, Ms. Boler has suffered and will continue to suffer harm, and is entitled to all equitable and legal remedies available under New York law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment of Defendant as follows:

(1) For compensatory, punitive, and/or exemplary damages in an amount to be determined by the trier of fact;

(2) For reasonable attorneys' fees, interest, and costs of the suit; and

(3) For such other and further relief as this Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to a jury trial.

Dated: New York, New York  
      April 28, 2020

Respectfully submitted,  
JOSEPH & KIRSCHENBAUM LLP

By:  *s/Lucas C. Buzzard*  
     D. Maimon Kirschenbaum  
     Lucas C. Buzzard  
     32 Broadway, Suite 601  
     New York, NY 10004  
     Tel: (212) 688-5640  
     Fax: (212) 688-2548